**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                   No.  CR-01-284 MV

RICARDO AGUIRRE-TELLO,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress Defendant's Identity **[Doc. No. 41]**, filed July 31, 2001. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is not well taken and will be **DENIED**.

## BACKGROUND

Defendant, who was born in Mexico, was convicted on November 1, 1989 in California for attempted murder.  On August 19, 1994, he was deemed removable by the INS.  On August 20, 1998, Defendant re-entered the United States without the government's permission.

On February 10, 2001, Defendant was the passenger in a vehicle driven by Richard Betancourt.  The vehicle drove into the primary inspection area at a United States Border Patrol fixed checkpoint west of Las Cruces, New Mexico.  According to the testimony of United States Border Patrol Agent Arturo Gonzalez, this occurred at 1:32 p.m.[1]  According to the testimony of Mr.

---

[1]  Agent Gonzalez's recollections of the timing of the events during the stop of Mr. Betancourt and Defendant were based on a written time line that he created in connection with what he described as "the first pretrial meeting."

Betancourt, this occurred at approximately 12:30 p.m.[2]  On cross-examination, however, Mr. Betancourt testified that it may have been 1:30 or 2:00 in the afternoon but the way he remembers it, it was around 12:30.   Agent Gonzalez approached the vehicle, greeted Defendant and Mr. Betancourt and asked them to state their nationality.  Mr. Betancourt stated that he was a United States citizen and, pointing to Defendant, stated that Defendant was a resident alien.  Agent Gonzalez testified that he thought it was odd that Mr. Betancourt answered for both himself and Defendant. Agent Gonzalez asked Defendant to show him his immigration documents.  Defendant showed him his resident alien card.   The resident alien card, which was unaltered and facially valid, bore Defendant's "personal identifiers," *i.e.*, his name, date of birth and alien registration number, photograph and fingerprint.  Agent Gonzalez returned the resident alien card to Defendant.  Agent Gonzalez then questioned Mr. Betancourt as to the ownership of his vehicle, their destination and where they were coming from.  Mr. Betancourt responded that they were coming from Jacksonville, Florida, where he had just purchased the vehicle, and that they were returning to California.  Agent Gonzalez asked Mr. Betancourt if he had any proof of ownership of the vehicle.  Mr. Betancourt found in the glove compartment an insurance card bearing the name Wendy Kinney from St. Simons, Georgia and handed it to Agent Gonzalez.   According to Mr. Betancourt, a second agent was walking around the vehicle and tapping on the sides of the vehicle.  Agent Gonzalez testified that he did not tap the vehicle and doesn't recall any other agent doing so.   After he reviewed the insurance card that Mr. Betancourt handed to him, Agent Gonzalez asked Mr. Betancourt to move his vehicle into the secondary inspection area.  Agent Gonzalez testified that this occurred approximately one

---

[2]  Mr. Betancourt testified that he never made any notes or memorialized the chronology of events that occurred during the stop.  His recollections of the time line from that day were based on his memory alone.

and one-half minutes after Mr. Betancourt and Defendant entered the primary inspection area, between 1:33 p.m. and 1:34 p.m. Mr. Betancourt testified that roughly ten minutes had passed before Agent Gonzalez referred them to the secondary inspection area.

Agent Gonzalez testified that he referred Defendant and Mr. Betancourt to the secondary inspection area because he wanted to clarify Mr. Betancourt's story. Specifically, he thought it was odd that, when he asked Mr. Betancourt how much money he had paid for the vehicle that he had just purchased, Mr. Betancourt stated that he did not know and that his wife had made the deal. In addition, Agent Gonzalez testified that he thought it was unusual that there was no proof of ownership of the vehicle and that Mr. Betancourt was unable to provide the purchase order, the bill of sale or the title signed over to him.

At the secondary inspection area, Agent Gonzalez attempted to clarify Mr. Betancourt's story, questioning him further about who had purchased the vehicle. Mr. Betancourt replied that his wife had purchased it. Agent Gonzalez then asked for Mr. Betancourt's consent to search the vehicle. Agent Gonzalez testified that he wanted to look inside the vehicle because he was concerned that the vehicle was stolen, that there were people hiding in the back, that there were immigration violations or that there were drugs and/or money concealed in the vehicle. According to Agent Gonzalez, Mr. Betancourt consented to the search. Mr. Betancourt testified that he did not remember whether anyone asked for his consent to search the vehicle. Mr. Betancourt also testified that if he had been asked to sign any forms allowing the agents to search his vehicle, he would have said yes. Agent Gonzalez then asked Mr. Betancourt and Defendant to step out of the vehicle and to wait inside the checkpoint office trailer. Both Defendant and Mr. Betancourt were patted down by the agents. According to Agent Gonzalez, this occurred at approximately 1:34 p.m.

According to Agent Gonzalez, he and another United States Border Patrol Agent, Agent Tercero, looked in the vehicle, opening the doors and looking under the seat. Agent Gonzalez testified that he found a note stating that Mr. Betancourt and Defendant were to pick up the vehicle at the airport in Jacksonville and providing detailed instructions as to where to find the vehicle and the keys. Agent Gonzalez further testified that the agents opened the back doors and noticed that some screws in the back quarter panels had been tampered with. Agent Gonzalez found this unusual as the vehicle was not old. Agent Gonzalez testified that the agents did not remove the panels but that he did call for a canine unit. According to Agent Gonzalez, while Defendant and Mr. Betancourt were inside the office trailer, there was a dog sniff of the vehicle. Agent Gonzalez testified that the dog alerted to the vehicle and, following the dog alert, the agents searched the vehicle thoroughly. The agents did not find any contraband during their search.

Agent Gonzalez testified that, at the point where he noticed the screws in the back quarter panels of the vehicle, he went inside the office trailer and asked Mr. Betancourt and Defendant for identification. Mr. Betancourt handed Agent Gonzalez his California driver's license and Defendant again gave him his alien resident card. Agent Gonzalez then conducted computer checks on both Defendant and Mr. Betancourt. According to Agent Gonzalez, this occurred at 1:40 p.m. Agent Gonzalez testified that the results of the checks came in approximately 30 seconds later. The results for Mr. Betancourt showed that he was a United States citizen and that he had been convicted of an aggravated felony for which he served 36 months on probation. The results for Defendant showed that he was convicted of an aggravated felony in 1989, that he was sentenced in 1989 and that he had been previously removed or deported to Mexico in 1994.

Agent Gonzalez testified that he then called sector radio, provided identifiers for Mr. Betancourt and Defendant, and requested that they perform checks to verify the results of the checks that he himself had performed.  Sector radio verified the information over the telephone and then sent a follow-up fax of the actual document showing the result of the computer check.  According to Agent Gonzalez, he received the telephone confirmation of the results of his computer check at 2:00 p.m. and received the fax at 2:32 p.m.  Agent Gonzalez testified that he advised Defendant of his *Miranda* rights at 2:00 p.m, right after he received the telephone confirmation of the results of his computer check.   Based on Agent Gonzalez's testimony, he arrested Defendant within 28 minutes of his arrival at the primary inspection area.

According to Mr. Betancourt, as soon as he and Defendant exited the vehicle at the secondary inspection area, at least four agents performed what he described as a thorough search of the vehicle, taking off the back quarter panel, searching through their personal belongings, opening the hood and all of the doors and looking from the bottom with mirrors.  Mr. Betancourt testified that the search took between 30 and 40 minutes.  According to Mr. Betancourt, he and Defendant were not asked to go inside the checkpoint office until at least one hour after they had entered the primary inspection area.   Mr. Betancourt testified that, once they were inside the office, the agents asked him and Defendant about their criminal records.  Mr. Betancourt also testified that he overheard the agents calling for a canine unit.  Further, Mr. Betancourt testified that it was another ten or fifteen minutes after that before the agents started running a check on Defendant's immigration status.  According to Mr. Betancourt, approximately one hour and ten minutes passed between their entry into the primary inspection area and Defendant's arrest.

On July 31, 2001, Defendant filed the instant Motion to Suppress Defendant's Identity.  The government filed an Opposition to Defendant's Motion to Suppress Identity on August 9, 2001.  On May 24, 2004, the government filed a Notice of Supplemental Authority on the Issue of Inevitable Discovery of Identity.  The Court held an evidentiary hearing on June 3, 2004.  At the conclusion of the hearing, defense counsel requested that the parties be permitted to provide closing arguments in writing.  The Court granted this request and took Defendant's motion under advisement.  Thereafter, Defendant filed his Closing Argument in Support of Defendant's Motion to Suppress Defendant's Identity on June 17, 2004.  The government's Response to Defendant's Closing Argument in Support of Defendant's Motion to Suppress Identity followed on June 29, 2004.  In addition, Defendant filed a Motion to Supplement Authority in Support of Defendant's Motion to Suppress on July 14, 2004.  The government filed a Response to Defendant's Motion to Supplement Authority in Support of Defendant's Motion to Suppress Identity on July 13, 2004.

## DISCUSSION

Defendant argues that his detention exceeded the scope of a lawful border patrol checkpoint stop.  Defendant further argues that his identity as a deported alien was discovered as a result of egregious Fourth Amendment violations that occurred during the stop.  Accordingly, Defendant concludes, his identity as a deported alien should be suppressed.

The government contends that the identity of a defendant is never suppressible as the fruit of an unlawful arrest.  In addition, the government contends that, even if one's identity could be suppressed, such suppression must rest upon a finding that unlawful police conduct had elicited the identity.  According to the government, the detention of Defendant was lawful and thus there is no basis for the suppression of his identity.

As set forth herein, the Court finds that Defendant's detention did not exceed the scope of a lawful border patrol checkpoint stop. Accordingly, there is no basis to suppress his identity. Because the Court finds that Defendant's identity was not discovered as the fruit of an unlawful arrest, the Court need not reach the issue of whether the identity of a defendant ever may be suppressed as the fruit of an unlawful arrest.

## I.     The Lawfulness of Defendant's Stop

In *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), the Supreme Court held that at a fixed checkpoint, border patrol agents may stop, briefly detain, and question individuals without any individualized suspicion that the individuals are engaged in criminal activity. *See Id.* at 562. Moreover, "[b]order patrol agents have 'virtually unlimited discretion to refer cars to the secondary inspection area.'" *United States v. Sanders*, 937 F.2d 1495, 1499 (10th Cir. 1991), *cert. denied*, 502 U.S. 1110 (1992). "[A] routine checkpoint inquiry may properly take place at a primary inspection area, a secondary inspection area, or both as long as the scope of the inquiry is appropriate." *United States v. Ludlow*, 992 F.2d 260, 263-64 (10th Cir. 1993).

"The principle protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop." *Martinez-Fuerte*, 428 U.S. at 566-67. Accordingly, "[a] routine checkpoint stop must be brief and unintrusive." *United States v. Rascon-Ortiz*, 994 F.2d 749, 752 (10th Cir. 1993). A routine checkpoint stop involves:

> questions concerning the motorist's citizenship or immigration status, and a request for documentation. A cursory visual inspection of the vehicle is also routine, and a few brief questions concerning such things as vehicle ownership, cargo, destination, and travel plans may be appropriate if reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband.

*Id.* at 752 (internal citations omitted).

If, during this initial, routine questioning an agent observes "suspicious circumstances," the agent also may "briefly question the motorist concerning those suspicions and ask the motorist to explain." *United States v. Massie*, 65 F.3d 843, 848 (10th Cir. 1995) (citation omitted). A suspicious circumstance is not equivalent to the reasonable suspicion standard. *Id.* Moreover, there is no single or narrow definition of a suspicious circumstance. *Id.* In construing what "suspicious circumstances" means:

> some deference is properly given to border patrol agents who, as law enforcement officers, are specifically trained to look for indicia of crime, with an emphasis on immigration and customs laws. So long as their interrogation bears a reasonable relationship to their unique duties, the judiciary is properly reluctant to interfere, and a reviewing court should only determine whether the suspicious circumstances as perceived by the border patrol agent are supported by the facts.

*Id.* (citation omitted). The court applies a "common sense view of the totality of the circumstances" to determine whether suspicious circumstances exist. *Id.* (citation omitted).

In summary, "during a routine fixed-checkpoint stop a border patrol agent may ask questions reasonably related to his duties and explore suspicious circumstances, but must be brief and unintrusive." *Id.* A stop within these parameters "is not custodial and *Miranda* warnings are not necessary." *United States v. Hudson*, 210 F.3d 1184, 1191 (10th Cir. 2000). The law is clear that any continued "detention of an individual beyond the scope of a routine checkpoint stop must be based upon reasonable suspicion, consent, or probable cause." *Massie*, 65 F.3d at 848.

For example, in *Massie*, the Tenth Circuit found the following evidence sufficient to support the agents' determination that suspicious circumstances existed: the defendant and his co-defendant gave conflicting answers as to where they had come from; the defendant appeared nervous because

he would not make eye contact with the agent and was speaking in a loud voice; the defendant and his co-defendant could not agree on whom they had been visiting; the co-defendant produced identification that the agent found suspect; and the defendant and his co-defendant gave conflicting answers when asked what was in the trunk of the car. *See Id.* at 849. In addition, the Tenth Circuit concluded that the agents' continued detention and questioning of the defendant did not exceed the confines of a routine checkpoint stop, because the questioning lasted only eight to eleven minutes from the time the defendants were stopped at primary to the moment the dog alerted on the trunk; the agents' questions were not overly intrusive; and the agents' questions about citizenship, vehicle ownership, vehicle contents, destination and travel plans all bore a reasonable relationship to the agents' duties. *See Id.*

During a routine fixed-checkpoint stop, consent is not required for a dog sniff. *United States v. Chavira*, 9 F.3d 888, 890 n.1 (10th Cir. 1993). Moreover, once a dog indicates the presence of narcotics, the agent has probable cause to conduct a search. *Id.* at 890. Consent to search, however, is required for "continued detention beyond the lawful period" of the routine fixed-checkpoint stop. *Id.* at 890 n.1.

In the instant case, Defendant argues that, once he showed Agent Gonzalez his facially valid alien registration card, his detention should have ended. In support of this argument, Defendant asserts that there is no evidence that there were suspicious circumstances to justify his continued detention. The Court disagrees. Applying a common sense view of the totality of the circumstances, there is ample evidence[3] to support Agent Gonzalez's determination that suspicious circumstances

---

[3]To the extent that Mr. Betancourt's testimony conflicts with Agent Gonzalez's testimony, the Court finds that Agent Gonzalez was a more credible witness. First, Agent Gonzalez created a written time line of the events of the stop not long after it occurred, while Mr. Betancourt's

existed to justify his continued detention of Defendant.  Moreover, the evidence shows that Agent Gonzalez's detention and questioning of Defendant did not exceed the confines of a routine checkpoint stop.  Agent Gonzalez first began to develop suspicion when, in response to his initial question regarding their nationality, Mr. Betancourt answered on behalf of Defendant.  Next, Agent Gonzalez found it suspicious that Mr. Betancourt had no documentation evidencing ownership of the vehicle and instead had only an insurance card bearing the name of Wendy Kinney from Georgia. Agent Gonzalez also found it suspicious that Mr. Betancourt did not know how much money he had paid for the vehicle that he had just purchased and that Mr. Betancourt first advised that he had purchased the vehicle but then stated that it was his wife who had purchased it.  Agent Gonzalez testified that he referred Mr. Betancourt and Defendant to the secondary inspection area to clarify their story.  It was not unreasonable for Agent Gonzalez to ask further questions to clarify why two California residents had traveled from California to Florida to pick up a used, unregistered vehicle on behalf of Mr. Betancourt or his wife.  Accordingly, Agent Gonzalez's questions were reasonably related to his duties and were a valid exploration of the suspicious circumstances that he perceived to exist.

Once at the secondary inspection area, after obtaining Mr. Betancourt's consent to a search of the vehicle,  Agent Gonzalez developed further suspicion when he noticed that some screws in the back quarter panels of the vehicle had been tampered with, especially given that the vehicle was not

_____

description of the chronology of events was based solely on his memory.  Mr. Betancourt himself admitted that he was unsure of the time that they arrived at the checkpoint and his time estimates were all approximations.  In addition, Mr. Betancourt testified that he was incarcerated for assault and bodily harm in 1988 or 1989, that has was convicted of possession of methamphetamine or marijuana, he could not remember which, in 1995 or 1996, and that he has had approximately fifty convictions for traffic tickets.  Finally, Mr. Betancourt and Defendant have been friends for many years.

old.  In addition, Agent Gonzalez found suspicious the note instructing where and how Mr. Betancourt and Defendant were to find the vehicle and the keys at the Jacksonville airport. Immediately upon discovering the screws and the note, Agent Gonzalez returned to the office trailer and asked Mr. Betancourt and Defendant for identification so that he could check their criminal history.  This action, too, was reasonably related to his duties and was a valid exploration of the suspicious circumstances that he perceived to exist.

Moreover, the duration of Defendant's detention did not exceed the scope of a reasonable checkpoint stop.  Mr. Betancourt and Defendant arrived at the primary inspection area at 1:32 p.m. Agent Gonzales referred them to the secondary inspection area at 1:33 p.m. or 1:34 p.m.  At 1:34 p.m., Agent Gonzalez instructed them to exit the vehicle and wait in the office trailer.  Agent Gonzalez asked Mr. Betancourt and Defendant for their identification and ran computer checks at 1:40 p.m.  Agent Gonzalez received confirmation by telephone of the results of the computer checks at 2:00 p.m.  Immediately thereafter, also at 2:00 p.m., Agent Gonzalez arrested Defendant. Accordingly, Defendant was arrested within 28 minutes of his arrival at the primary inspection area.[4]

## CONCLUSION

The facts presented at the evidentiary hearing demonstrate that suspicious circumstances existed to justify Agent Gonzalez's detention of Defendant after Defendant first presented him with his alien registration card.  Moreover, the evidence shows that Agent Reyes' detention and questioning of Defendant were of reasonable duration and did not exceed the confines of a routine

---

[4]Even if, as Mr. Betancourt testified, Defendant was arrested one hour and ten minutes after they entered the primary inspection area, given Agent Gonzalez's diligent pursuit of a means of investigation during this period, the duration of the stop was not unreasonable.

checkpoint stop.  Accordingly, Defendant's identity was not discovered as the fruit of an unlawful arrest. There thus is no basis to suppress his identity.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress **[Doc. No. 41]** is hereby **DENIED**.

Dated this 4th day of March, 2005.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:
Peter Levitt

Attorney for Defendant:
Felipe Millan