IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

           Plaintiff,

vs.

                                        No.  CR 01-284 MV

RICARDO AGUIRRE-TELLO,

           Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion for Downward Departure and Sentencing Memorandum filed October 21, 2005 **[Doc. No. 78]**.  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, ruled at Defendant's sentencing hearing that a three-level reduction for cultural assimilation is appropriate. The Court now sets forth the basis for its prior ruling in this Memorandum Opinion.

## PROCEDURAL BACKGROUND

On March 6, 2001, Defendant was charged by Indictment **[Doc. No. 13]** with illegal re-entry into the United States after having been deported, in violation of U.S.C. § 1326(a), (b)(2). Defendant subsequently filed a Motion to Dismiss Indictment **[Doc No. 40]** on July 31, 2001. On January 22, 2002, the Court granted Defendant's Motion and dismissed the Indictment, ruling that Defendant's underlying deportation proceeding had been fundamentally unfair **[Doc. No. 52]**. The government appealed the Court's order dismissing the Indictment against Defendant  **[Doc. No. 53]**.  A divided Tenth Circuit panel affirmed the Court's ruling.  The government petitioned

for re-hearing *en banc*.  Upon re-hearing, the Tenth Circuit reversed and remanded for further proceedings.[1]

Prior to Defendant's sentencing hearing, Defendant filed a timely Motion for Downward Departure and Sentencing Memorandum **[Doc. No. 78]**.  Defendant requested a downward departure of five levels to an Offense Level of sixteen, which would result in a sentence of twenty-seven to thirty-one months.  Defendant argued this departure was appropriate based on his cultural assimilation to the United States, contending that his close and longstanding ties to this country and lack of connection to the country to which he was deported is a mitigating factor in his conduct.  The government failed to file a timely opposition to Defendant's Motion, but submitted untimely papers shortly before the sentencing hearing **[Doc. No. 79]**.[2]  The Court sentenced Defendant on November 15, 2005.

## FACTUAL BACKGROUND

On February 10, 2001, Defendant was encountered at the United States Border Patrol checkpoint near Las Cruces, New Mexico.  He was a passenger in a car with California license plates.  The car was referred to the secondary inspection unit for further questioning.  Defendant showed agents a resident alien card.  Officers conducted a background check, which revealed that

---

[1]  The *en banc* panel addressed the following questions:  (1) did Defendant have a constitutional right to be informed of discretionary relief in the form of a waiver from deportation that might be available to him; and (2) did he establish that deficiencies in his deportation proceeding caused him prejudice.  The panel answered both questions in the negative.

[2]  At the sentencing hearing the government falsely told the Court that it had missed the filing deadline by only four days.  Sentencing Tr. 3:2, Nov. 15, 2005.  In fact, the government missed its filing deadline by nine days, failed to request an extension, and failed to notify the Court that it contested Defendant's Motion.  Thus, the government left only three working days for Defendant to absorb the government's brief and prepare for the hearing.

Defendant had been deported from Calexico, California on August 19, 1994.  This deportation

was subsequent to a conviction for an aggravated felony in Superior Court of California, County

of Los Angeles, specifically, an attempted murder for which Defendant was sentenced to ten years

in prison.  Upon discovery of this prior deportation, Mr. Aguirre-Tello was taken into custody.

Defendant Aguirre-Tello was charged with Re-entry of Deported Alien Previously

Convicted for an Aggravated Felony, pursuant to 8 U.S.C. §§ 1326(a)(1), 1326(b)(2).

## DISCUSSION

In all cases, to determine a reasonable sentence, this Court first will determine the

appropriate advisory Sentencing Guidelines ("Guidelines") range, examining departure arguments

and factual objections to the Presentence Report ("PSR").

## I.     Advisory Guidelines Range

On April 1, 2005, Defendant pled to the indictment without benefit of a plea agreement.

The PSR assigned Defendant a Base Offense Level of eight pursuant to U.S.S.G. § 2L.1.2.[3]

Defendant received a sixteen-level enhancement because he had been previously deported

following a conviction for a crime of violence, as mandated by U.S.S.G. §2L1.2(b)(1)(A)(ii).

This enhancement brought Defendant's total adjusted Offense Level to twenty-four.  Defendant

received a three-level departure for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1,

bringing the Offense Level to twenty-one.

The PSR assigned Defendant a Criminal History Category of III (four criminal history

points) based on two prior offenses.  First, Defendant received three points for a conviction for

attempted murder that occurred in 1989 when Defendant was twenty years old.  Second,

_____

[3]  The Court references the 2004 Edition of the Guidelines.

Defendant received one point for a 2003 conviction for possession of a controlled substance (methamphetamine) and driving under the influence of alcohol/drugs.[4]

The Guidelines Sentencing Table sets the sentencing range for an Offense Level of twenty-one and a Criminal History Category of III at forty-six to fifty-seven months.

## II.    Downward Departure

Section 5K2.0 of the United States Sentencing Guidelines grants the Court discretion to depart from the applicable sentencing range if "'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'"   U.S.S.G. §5K2.0 (quoting 18 U.S.C. §3553(b)).

The Guidelines do not and cannot account for all factors that may provide potential bases for departure, as it is impossible to prescribe "a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." *Koon v. United States*, 518 U.S. 81, 93 (1996), quoting 1995 U.S.S.G. ch. 1, pt. A, intro. comment. 4(b).   For this reason, potential departure factors that make cases atypical "cannot, by their very nature, be comprehensively listed and analyzed in advance."  1995 U.S.S.G. § 5K2.0.  The Commission has categorically prohibited consideration of only a few factors.[5] *Koon*, 518 U.S. at 93.  In

---

[4] For this conviction, Defendant received a deferred judgment, eighteen months probation as to the possession charge, and two days in jail followed by thirty-six months informal probation, as well as a $1254.00 fine for the D.U.I. charge.  He successfully completed Drug Court and was discharged from supervision.

[5] Factors that are not considered relevant to a sentencing determination include:  Race, sex, national origin, creed, religion, socio-economic status (U.S.S.G. § 5H1.10); lack of guidance as a youth (U.S.S.G. § 5H1.12); and physical condition or drug or alcohol dependence (U.S.S.G. § 5H1.4).

enumerating those factors, the Commission stated its intention not to limit "the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." 1995 U.S.S.G. ch. 1, pt. A, intro. comment. 4(b). Thus, a court may consider any factor as a potential basis for departure, unless the Guidelines specifically and categorically prohibit its consideration. *Koon*, 518 U.S. at 109.

In a case presenting unusual factors not sufficiently accounted for in the Guidelines, a sentencing court has broad discretion to consider a departure. To do so, a court must compare the facts of a defendant's case to other cases falling within the same Guidelines category, and determine whether the defendant's case is sufficiently atypical to remove it from the heartland of the other cases. *See Koon*, 518 U.S. at 98; *United States v. Fagan*, 162 F. 3d 1280, 1283 (10th Cir. 1998). Upon determining that a case is sufficiently unusual, the Court may exercise its discretion to depart from the Guidelines.

### 1.   <u>Cultural Assimilation</u>

In the case at hand, the issue is whether the Court may grant a departure based on Defendant's cultural assimilation. That is, the Court must consider whether Defendant's longstanding ties to the United States remove his case from the heartland of other defendants who have illegally re-entered the United States after having been deported following a conviction for a crime of violence. Defendant, unlike most illegal re-entry defendants who appear before this Court, was brought here by his parents at the age of four, and has subsequently lived in the same community in California for nearly thirty years. In contrast to most illegal re-entry defendants this Court has sentenced, Defendant has not crossed back and forth across the border in order to earn money to send to family in Mexico. His family, like Defendant, has long been firmly rooted in the

United States.  Finally, Defendant is different from most defendants convicted of illegal re-entry in that English is his primary language, and he is, culturally, an American.  Thus, the Court concludes Defendant's extraordinary circumstances and background call for a departure based on his cultural assimilation, which is a permissible ground for departure under the Sentencing Guidelines.

Cultural assimilation is absent from the list of factors that the Guidelines has indicated are not relevant in sentencing.[6]  Moreover, several circuits have squarely held that cultural assimilation constitutes a permissible ground for departure.  *U.S. v. Castillo*, 386 F.3d 632 (5th Cir. 2004), *cert. denied*, 125 S. Ct. 675 (U.S. 2004) (per curiam); *United States v. Rodriguez-Montelongo*, 263 F.3d 429 (5th Cir. 2001); *United States v. Lipman*, 133 F.3d 726 (9th Cir. 1998); *United States v. Sanchez-Valencia*, 148 F.3d 1273 (11th Cir. 1998) (per curiam).

The seminal case addressing cultural assimilation is *United States v. Lipman*, in which the Ninth Circuit held that cultural assimilation is a permissible ground for departure under the Sentencing Guidelines, and that a district court may properly consider evidence relating to this factor.  *Lipman*, 133 F.3d at 728.  The *Lipman* defendant lost his permanent residence status and was deported to Jamaica, pursuant to 8 U.S.C. § 1251(a)(2), after numerous felony convictions for possession of a weapon, attempted possession of marijuana, unlawful imprisonment, two counts of sexual abuse, and attempted robbery.  *Lipman*, 133 F. 3d at 728.  In 1996, Lipman re-entered the United States and was arrested ten days later for possession and transportation for

---

[6] A departure for what is imprecisely termed "cultural assimilation" is analogous to the factor of family and community ties discussed in U.S.S.G. § 5H1.6.  It is not related to the impermissible factors of national origin, addressed by U.S.S.G. § 5H1.10, or alienage, as discussed in *United States v. Mendoza-Lopez*, 7 F.3d 1483 (10th Cir. 1993).

sale of approximately thirty-nine pounds of marijuana. *Lipman*, 133 F. 3d at 728.  Lipman

subsequently pled guilty to illegal re-entry after being deported for a felony conviction, in

violation of 8 U.S.C. § 1326(a) and 1326§(b)(1), and requested a downward departure on several

grounds, including cultural assimilation.

      In arguing for a departure based on cultural assimilation, Lipman argued that he was not

the typical illegal re-entry defendant because he was a "*de facto* American" with significant ties to

the United States. *Lipman*, 133 F. 3d at 729.  His mother brought him to the United States from

Jamaica when he was twelve years old, and then he resided in the United States for twenty-three

years. *Lipman*, 133 F. 3d at 729.  He attended American schools throughout his life and he

married an American citizen with whom he raised five children, all United States citizens.

*Lipman*, 133 F. 3d at 729.  His family, including his mother, three siblings, wife and five children,

resided in the United States as American citizens. *Lipman*, 133 F. 3d at 729.  Lipman argued that

his cultural assimilation mitigates his culpability for the crime of illegal re-entry because the re-

entry was "'motivated by his cultural emotional and psychological ties to this country . . .

developed because of a parental decision to emigrate the defendant as a child.'" *Lipman*, 133 F.

3d at 729.  He argued that unlike the typical re-entry defendant who lacks significant ties to the

United States and is motivated by economic needs, his return to the United States was motivated

by familial concerns.  According to Lipman, his motive for re-entry was his desire to visit his

disabled American daughter after he learned that she had been molested.

      The sentencing court noted, however, that after illegally re-entering the United States,

Lipman traveled to Los Angeles instead of going to his daughter's home in New York. *Lipman*,

133 F. 3d at 729.  In fact, Defendant had not traveled to his family even ten days after arriving in

the United States.  Moreover, when arrested, Lipman was transporting thirty-nine pounds of

marijuana.  *Lipman*, 133 F. 3d at 728.  These facts led the district court to conclude that Lipman's

ties to the United States did not justify a downward departure for cultural assimilation.  *Id.*

On appeal, the Ninth Circuit upheld the district court's ruling.  In doing so, however, the

appellate court affirmed the general principle that under certain circumstances a sentencing court

may properly consider cultural assimilation as a ground for departure, although such a departure

was not applicable in *Lipman*.  In so holding, the Ninth Circuit made the following observations

about cultural assimilation:

> [C]ultural assimilation is distinguishable from the threat of future
> deportation because a defendant's cultural assimilation speaks to his
> offense and to his character.  Recognizing cultural assimilation as a
> factor that may justify departure therefore would not result in the
> arbitrary dividing line between all aliens and citizens that
> we rejected in *Alvarez-Cardenas*.  For example, cultural assimilation
> may be relevant to sentencing under U.S.S.G. § 2L1.2 if a district
> court finds that a defendant's unusual cultural ties to the United
> States--rather than ordinary economic incentives--provides the
> motivation for the defendant's illegal re-entry or continued presence
> in the United States.  Cultural assimilation may also be relevant to
> the character of a defendant sentenced under U.S.S.G. §2L1.2
> insofar as his culpability might be lessened if his motives were
> familial or cultural rather than economic.  Thus, unlike the general
> threat of deportation, cultural assimilation is a fact-specific ground
> for departure that may speak to an individual defendant's offense,
> his conduct and his character, and not just to possible future events
> unrelated to the defendant's individual circumstances.[7]

_____

[7] In the instant case, the government advances the argument that cultural assimilation should be an improper basis for departure because, morally, there should be no difference in the blameworthiness of those immigrants who enter the United States illegally to be with, and financially support, their family members who are here, and those who come illegally to find work to be able to support their families who happen to live elsewhere.  Regardless of what the government may think of this distinction that favors immigrants with family members already in the United States, it is one upon which Congress has based immigration policies, such as the law that affords a special "preference status" to certain aliens who share relationships with United

133 F.3d at 731.  Thus, *Lipman* makes clear that if a defendant's re-entry is motivated by his ties to his family and American culture, rather than primarily economic reasons, or with the goal of engaging in criminal enterprise, the court may consider a downward departure.

In addition to the Ninth Circuit, the Fifth and Eleventh Circuits have recognized cultural assimilation as a permissible basis for downward departure under certain circumstances.  *See U.S. v. Castillo*, 386 F.3d 632 (5th Cir. 2004), *cert. denied*, 543 U.S. 1029 (2004) (defendant was entitled to a downward departure based on cultural assimilation where he was brought to the United States at the age of three, lived in the United States continuously for eighteen years until deported, he spoke English fluently, and his parents, siblings, and children lived in the United States); *United States v. Rodriguez-Montelongo*, 263 F.3d 429, 432-33 (5th Cir. 2001); *United States v. Sanchez-Valencia*, 148 F.3d 1273, 1274 (11th Cir. 1998) (per curiam) (sentencing court's discretionary refusal to depart downward was not appealable because that court properly recognized its authority to grant a departure for cultural assimilation).

In a series of published and unpublished opinions, the Tenth Circuit has recognized a sentencing court's authority in extraordinary cases to depart downward on the basis of a defendant's cultural assimilation.  In the following cases, the Tenth Circuit held that it could not review the sentencing court's denial of a defendant's request for a downward departure based on cultural assimilation because the sentencing court was aware of its authority to grant a departure

---

States citizens or permanent resident aliens.  *See, e.g.,* 8 U.S.C.A. § 1151(b) (prospective immigrants with "immediate relative" status (spouses, children, and parents of a United States citizen) may avoid various quarterly and annual limitations on the numbers of aliens who may be issued immigrant visas or otherwise become permanent residents).

for cultural assimilation, and properly exercised its discretion to determine that such a departure

was not warranted under the circumstances.[8]  *See U.S. v. Lozano-Morales*, 116 Fed. Appx. 236,

2004 WL 2677687, at *238 (10th Cir. Nov. 24, 2004), *op. reinstated*, 133 Fed. Appx. 490 (10th

Cir. May 26, 2005), *cert. denied*, 126 S.Ct. 587, 74 USLW 3274 (Oct. 31, 2005); *United States*

*v. Heredia-Cruz,* 328 F.3d 1283, 1289-90 (10th Cir. 2003); *U.S. v. Gale*, 56 Fed. Appx. 461,

2003 WL 550137, at *462 (10th Cir. Feb. 27, 2003); *United States v. Gonzalez-Lopez*, 41 Fed.

Appx. 286, at *287 N.1 2002 WL 997484 (10th Cir. May 16, 2002); *U.S. v. Flores-Venegas*, 41

Fed. Appx. 295, 2002 WL 1004046, at *296 (10th Cir. May 17, 2002); *United States v.*

*Padilla-Michel*, 52 Fed. Appx. 450, 2002 WL 31716626, at *453 (10th Cir. Dec. 04, 2002),

*United States v. Gonzalez-Portillo*, 10 Fed. Appx. 654, 2001 LW 280474, at *655 (10th Cir.

Mar. 22, 2001); *United States v. Ulloa-Porras*, 1 Fed. Appx. 842, 2001 WL 15527, *844-45

(10th Cir. Jan. 8, 2001); *U.S. v. Sanchez-Dominguez*, 17 Fed. Appx. 895, 2001 WL 964975, at

*897 (10th Cir. Aug. 24, 2001); *United States v. Marin*, 1 Fed. Appx. 845, 2001 WL 15529, at

*847 (10th Cir. Jan. 8, 2001); *U.S. v. Espinoza-Ramirez*, 182 F.3d 933, 1999 WL 381106, at *1

(10th Cir. Jun. 11, 1999); *U.S. v. Garcia-Villapando*, 176 F.3d 489, 1999 WL 228186, at *1

(10th Cir. Apr. 20, 1999).[9]  Thus, the Tenth Circuit has not squarely addressed under what

circumstances a departure for cultural assimilation is warranted.

---

[8] *Cf. United States v. Fagan*, 162 F.3d 1280, 1282 (10th Cir.1998) (a refusal to depart downward was reviewable where the sentencing court "specifically rul[ed] that it did not have the discretion to consider remorse as a factor to support the downward departure").

[9] The Tenth Circuit Rule 36.3(B) states:  "Citation to an unpublished decision is disfavored. But an unpublished decision may be cited to if: (1) it has persuasive value with respect to a material issue that has not been addressed in a published opinion; and (2) it would assist the court in its disposition."  These unpublished decisions meets the criteria set forth in Rule 36.3(B), and therefore citation to these unpublished decisions is proper.

In *United States v. Martinez-Alvarez*, 256 F. Supp 2d 917, 920 (E.D. Wis. 2003), the district court found that the following factors are relevant in determining whether to grant a downward departure on the basis of cultural assimilation:  (1) the length of time the defendant has lived in the United States, under the theory that "a person who has lived here most of his life is more likely to have been assimilated...than one who has resided in this country for just a few months or years"; (2) the defendant's level of familiarity with his country of origin, under the theory that a person "deported to a country he does not know will have a greater motivation to leave than one deported to a more familiar environment"; (3) the defendant's family ties – i.e. does nearly all of his family reside in the United States?; (4) what the defendant did and where he went upon re-entry – "[d]id he immediately return to his family, or did he take a detour into other into other endeavors?"   By considering these factors, the court can "determine the degree of the defendant's assimilation and the sincerity of his professed motivation in re-entering the country unlawfully."  *Id*.  Applying those factors, the court found that they weighed in favor of a departure because the defendant had lived in the United States virtually his entire life, had no experience living in Mexico, had nearly all of his family in the United States, and upon re-entry he returned to Chicago, where his mother and daughter resided.  The court stated:

> I find that this case is sufficiently unusual to merit a small departure. Most unlawful re-entry defendants I have seen lack defendant's ties to this country; as a practical matter, defendant was raised and lived as an American his entire life.  Had his mother entered this country just six months earlier, defendant would be a citizen by virtue of his birth in the United States.  Upon deportation, defendant will be sent to a country he does not know. ... There is no evidence that he returned to continue a life of crime.  Rather, he returned to the area of the country where his family lived, obtained work, and tried to be a father to his child.

*Id.* at 921.

Similarly, in *United States v. Reyes-Campos*, 293 F. Supp. 2d 1252, 1255-57 (M.D. Ala. 2003), the court approved a departure based on defendant's cultural assimilation, using as a guide the factors outlined in *Martinez-Alvarez*.  The court found that the defendant came to the Untied States at a young age (nine), he was educated in the United States, almost all of his family lived in the United States, and there was no evidence that the defendant came to the United States to commit crimes.  *Id.* at 1259.

In the instant case, Defendant presented compelling evidence that his re-entry was motivated by his long-term ties to the United States, and his desire to return to his family here. Defendant has lived in the United States for approximately thirty years.  His connection to this country developed because of his parents' decision to bring him to the United States when he was four years old.  He was educated in this country, attending American elementary, junior high, and high schools.  Nearly all of his family, including his parents, wife, children, and siblings, live in the United States.  Sentencing Tr. 16, Nov. 15, 2005.[10]  Defendant's wife, son, and daughter are United States citizens.  He and his family have lived in the same community in southern California for nearly thirty years.   His primary language is English, and English is the language he most often speaks at home with his wife and children.  *Id.* at 13.  He considers himself an American. By contrast with his strong ties to the United States, Defendant has few ties to Mexico, and upon deportation he will be sent to a country that is not his home.

In this case, when Defendant re-entered the United States, he was with his cousin, headed

---

[10] Defendant has a grandmother who resides in Mexico.  Sentencing Tr. 16, Nov. 15, 2005.

to California to return to his family and home.  While most individuals who illegally enter the United States from Mexico do so for economic reasons, Defendant returned to this country motivated by his self-identification as an American, his desire to be with his family and return to California, his home of nearly thirty years.

Moreover, unlike the *Lipman* defendant and many illegal re-entry defendants who come before this Court, Defendant entered the United States without drugs or contraband, and without a plan to engage in a criminal enterprise.  By contrast, the defendant in *Lipman* did not go to be with his family or return to a legitimate community upon illegally reentering the country.  Rather, he was engaged in the possession and transportation for sale of thirty-nine pounds of marijuana. From these facts, it was reasonable for the sentencing court to conclude that Lipman's primary motive for illegally returning to the United States was not his legitimate cultural ties to this country, but rather to engage in criminal enterprise and drug trafficking.  Accordingly, the *Lipman* court concluded that a departure for cultural assimilation, which is warranted only when the illegal re-entry is motivated primarily by a defendant's desire to return to his family and community in the United States, was not appropriate.

By contrast, in this case Defendant's extensive cultural, familial, and emotional ties to the United States motivated his continued presence here, and his illegal re-entry.  Therefore, the Court concludes that Defendant's cultural assimilation mitigates his culpability for re-entering unlawfully because this assimilation was the primary motivation for his return.  *See United States v. Marin*, 1 Fed. Appx. at *847 (a departure for cultural assimilation cannot be granted where cultural assimilation has no bearing on the defendant's culpability for the particular offense at issue).

-13-

At Defendant's sentencing hearing the government stated that "clearly, based on the testimony of his employer and his wife, [Defendant is] obviously a good family man and a good worker. . . ."  The government did not challenge Defendant's evidence of his cultural and familial ties to the United States, nor present contradictory evidence.  Sentencing Tr. 22:4-7, Nov. 15, 2005.  Nonetheless, the government contends that Defendant's criminal history proves that Defendant's assimilation to this country has been to only a criminal element of society, and therefore does not constitute legitimate cultural assimilation.  *Id.*; Pl.'s Resp. 1.  Defendant was convicted of attempted murder in 1989 when he was twenty years old and had been living in the United States for sixteen years.  That case resulted in Defendant's removal from the United States, the terms of which he violated when he re-entered the United States and thus committed the instant offense of re-entry.  The government argued that Defendant's prior conviction demonstrates a history of violence that precludes a departure for cultural assimilation.  Sentencing Tr. 20, Nov. 15, 2005.  The Court recognizes that a conviction for attempted murder is indeed a serious offense.  For this reason, the Court has carefully reviewed the police reports relating to the attempted murder, which were obtained by the United States Probation Office.  These documents provide detailed information about the circumstances of the offense, and Defendant's secondary role in it.

In that case, Defendant, along with four co-defendants, was charged with the attempted murder in violation of California Penal Code Section 664/187(a).[11]  According to Monrovia,

---

[11] The charging document further alleged that this offense was a serious felony within the meaning of Penal Code Section 1192.7(c)(1), and that the offense was committed with a firearm within the meaning of Penal Code Section 12022(a).  Police reports indicate that all of the defendants were affiliated with a gang although no gang related offenses were charged.

-14-

California Police Department reports, at approximately 11 p.m. on May 7, 1989, Defendant was in the driver's seat of his small pick-up truck, which was parked on the street in front of the victim's house.  There were two individuals in the truck's cab along with Defendant, and approximately five men in the truck's bed.  Witnesses heard the victim, who was in his front yard, telling someone to get away from his house.  Subsequently, two men, Defendant's co-defendants, jumped out of the bed of the truck and walked into the victim's yard.  They argued with the victim and a fight broke out.  Other men got out of the truck, ran into the yard, and began hitting the victim with their fists and beer cans.  Defendant told police that he did not get out his truck, and witnesses did not identify Defendant as one of the men who participated in the attack on the victim.  One of the co-defendants who had started the fight took out a pistol and fired several rounds, some of which struck the victim.  The victim's injuries were not fatal.  Defendant consistently stated that throughout the fight he remained in his truck, a fact corroborated by witnesses.  After the shooting, Defendant's co-defendants ran from the yard and jumped into the back of Defendant's truck as he drove away.  Later, Defendant's co-defendants jumped out of the back of Defendant's truck and he drove alone toward his home.  Defendant was arrested there after being identified by his truck.  Defendant was not present when, later that night, police had further contact with his co-defendants, who committed additional offenses.  At Defendant's sentencing hearing, the government offered no evidence disputing Defendant's secondary role in the offense.

Defendant's recent life has not been without stumble.  In 2003, Defendant suffered a conviction for driving while intoxicated and drug possession.  While Defendant's drug use was illegal and deplorable, it does not undermine the fact of his legitimate cultural assimilation to the

United States.  The Court notes the following facts relating to this conviction:  This 2003 offense,

his single drug-related conviction, came fourteen years after his one prior conviction; the offense

involved drug possession for personal use, not distribution; and, after being convicted Defendant

successfully completed Drug Court and probation, and was discharged from supervision.

Thus, the Court has carefully considered the circumstances of Defendant's sixteen-year-

old conviction, and his secondary role in it, as well as his more recent drug-related offense.  This

examination of the facts and circumstances of these convictions, as well as the other evidence

regarding Defendant's life in the United States leads the Court to conclude that these offenses do

not preclude consideration of Defendant's cultural assimilation as a basis for departure.

According to the uncontroverted evidence presented in Defendant's Motion and at his hearing, it

is quite inaccurate to characterize Defendant's assimilation to this country as being only to a

criminal facet of society.  While Defendant was in prison serving his sentence for his 1989

conviction, he obtained his G.E.D.  For the past decade, Defendant has been employed by the

same company, Newton Heat Treating, a small aerospace firm in El Puente, California.  The

company's owner and president, Gregory Newton, traveled from California to Las Cruces, New

Mexico to testify on behalf of Defendant at his sentencing hearing.  Mr. Newton testified that

Defendant had worked for him for ten years and was an "exceptional" employee who worked his

way up from clearing weeds and driving a truck to working as a supervisor in the company's

Quality Certification Department.  Sentencing Tr. 7-8, Nov. 15, 2005.  As a supervisor,

Defendant was responsible for making the final certification on heat treating and cold stabilization

processes on aerospace parts, many of which are ultimately used by the military.  *Id.* at 8-11.

Defendant was respected and well liked by his co-workers, subordinates, and the firm's

-16-

customers, and he ranked as one of the company's top employees.  *Id*. at 12.  This employment record, which is extraordinary when compared the employment histories of most illegal re-entry defendants who have appeared before this Court, directly contradicts the government's contention that Defendant's assimilation has been to only a criminal element of society.[12]

Furthermore, for the past ten years Defendant has been in a stable marriage that has produced two children.  *Id*. at 13.  Defendant is an excellent provider for his family, and a loving and involved father.  Along with fulfilling his other family responsibilities, Defendant diligently looks after his children's religious education.  *Id*. at 18, 14.  This evidence of Defendant's strong familial relationships is further proof that Defendant is indeed culturally assimilated into the mores and ethics of the United States, and his assimilation has been to a legitimate facet of our society.[13]

The Court concludes that the unique and compelling circumstances of Defendant's case are extraordinary enough to place him outside the heartland of cases in his Guidelines category, and that a sentencing departure based on Defendant's cultural assimilation is warranted.

## 2.  __Degree of Departure__

---

[12] The Court considers Defendant's employment history only to the extent that it demonstrates Defendant's long-term, legitimate ties to the United States, and thus contradicts the government's contention that Defendant's assimilation has been only to a criminal segment of society.  *See* U.S.S.G. § 5H1.5 (a defendant's employment record is not ordinarily relevant in determining whether a departure is warranted).

[13] These facts suggest that at some point at least ten years ago Defendant initially re-entered the United States without inspection or permission from the Attorney General.  However, this apparently illegitimate but unadjudicated prior re-entry does not change the Court's determination that a departure is warranted.  The basis for the departure granted in this case is Defendant's cultural assimilation that predated both the current instance of illegal re-entry, as well as his apparent decade-old re-entry.  *Cf. U.S. v. Rivas-Gonzalez*, 384 F.3d 1034, 1044-45 (9th Cir. 2004) (declining to extend the ground for departure of cultural assimilation to a case where the asserted cultural assimilation arose only after the defendant's illegal re-entry as an adult).

In addition to explaining the grounds for a downward departure, the Court must also "specifically articulate reasons for the degree of departure using any *reasonable methodology hitched to the Sentencing Guidelines*, including extrapolation from or analogy to the Guidelines." *United States v. Goldberg*, 295 F.3d 1133, 1138 (10th Cir. 2002) (citations omitted) (emphasis in original). The Guidelines do not, however, specifically delineate the proper method for determining the degree of departure, but rather state that the "decision as to whether and to what extent departure is warranted rests with the sentencing court on a case-specific basis." U.S.S.G. § 5K2.0. The Tenth Circuit has required a sentencing court to extrapolate from or analogize to the Guidelines when determining the degree of departure without providing guidance as to how exactly this may be accomplished. *See Goldberg*, 295 F.3d at 1138. Moreover, a sentencing court may not justify a degree of departure "by referring to the resulting sentence rather than to an analogy to the Guidelines." *Id.* at 1140. Therefore, the Court cannot depart a certain number of levels to reach a specific sentence -- for example, to avoid incarceration.

The Court has seriously studied and considered the basic purposes of criminal punishment as articulated by the Guidelines. The Court has weighed the goals of just punishment, deterrence, rehabilitation and uniformity of sentences against the express contemplation of sentences "outside the range established by the applicable Guidelines if the court finds that there exists [a] . . . mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." U.S.S.G. § 5K2.0 (citation omitted). Thus, the Court has compared Defendant's case to the cases of the many illegal reentry defendants who have come before it for sentencing. The Court has determined that a three-level departure based on Defendant's cultural

-18-

assimilation will incorporate the mitigating factors warranting a sentence below the Guideline range, while properly maintaining the integrity of the basic purposes of criminal punishment.  With a three-level departure, Defendant faces a sentence of thirty-three months.  This term of imprisonment sufficiently satisfies the various goals of punishment, including deterrence, respect for the law, and the protection of the public.

In reaching this conclusion, the Court again emphasizes the unique circumstances of this case.  It is the Court's belief that a case like this one was not adequately accounted for by the Sentencing Commission when it formulated the relevant Guideline provision.  Moreover, the decision to sentence Defendant at an Offense Level of eighteen represents this Court's "attempt to predict the sentencing range the Sentencing Commission would have established if it had considered the circumstances."  *See United States v. Cordova*, 337 F.3d 1246, 1249 (10th Cir. 2003).  The Court is convinced that if faced with a defendant whose circumstances of cultural assimilation were as exceptional as Mr. Aguirre-Tello's, the Sentencing Commission would have set a Guideline range of thirty-three to forty-one months.

<u>**CONCLUSION**</u>

At the sentencing hearing on November 15, 2005, the Court granted a three-level downward departure based upon cultural assimilation.  With a criminal history level of III and an Offense Level of eighteen, Defendant faced a guideline range of thirty-three to forty-one months. The Court imposed a sentence of thirty-three months.

This Opinion and Order shall be appended to Defendant's judgment and commitment form.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Downward Departure

-19-

**[Doc. No. 78]** is **GRANTED IN PART**.

It is thereby **ORDERED** that Defendant is sentenced to a term of thirty-three months.

**DATED** this 2nd day of February, 2006.

_____
MARTHA VAZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorney for the United States:
Mark Saltman

Attorney for Defendant:
Felipe Millan

-20-